UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO.: 4:06CV-35-M

LANCE L. FERRIS and KATHLEEN L. FERRIS                          PLAINTIFFS

v.

TENNESSEE LOG HOMES, INC., et al.                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon motions by the defendants, Tennessee Log Homes, Inc. [DN 75] and Vince and Pat Zara [DN 72], for summary judgment.  Tennessee Log Homes, Inc. also moves in limine [DN 74] to exclude or limit the testimony of the three witnesses designated by the plaintiffs as experts.  Fully briefed, these matters are ripe for decision.

## I.  FACTS

The facts of this case are relatively undisputed.  The plaintiffs, Lance and Kathleen Ferris (the "Ferrises"), began planning for their retirement in the mid-1990s.  Working as insurance industry professionals in the Chicago area, the Ferrises began looking for land in eastern Tennessee where they could build a log home.  At first, their efforts were unsuccessful until a few years later, a developer introduced them to land that was available on Lake Malone in Muhlenberg County, Kentucky.  Lance and Kathleen purchased two adjacent lots on Lake Malone in 1999 and after performing years of research on log home manufacturers, the Ferrises decided to purchase their custom log home from the defendant, Tennessee Log Homes, Inc. ("TLH").

Around January 2001, the Ferrises contacted TLH to express their interest in purchasing a Tennessee Log Home.  Lance spoke with John "Jock" Davidson, III, TLH's vice president of sales and marketing.  Jock referred Lance to Vince and Pat Zara (the "Zaras"), TLH's licensed dealer in

western Kentucky.  The Zaras made their sales pitch to the Ferrises: they discussed various model packages that TLH had available, they discussed customizing various aspects of TLH's blueprints to suit the Ferris' needs, and they toured another TLH home on Lake Malone.  The Ferrises liked what they saw and decided to purchase a custom TLH log home.  Pursuant to a licensing agreement between TLH and the Zaras, the Zaras had no authority to enter into a contract for the sale of a TLH home without TLH's approval.  Instead, the Zaras informed TLH of the model home the Ferrises chose and the custom changes requested by the Ferrises.  TLH prepared a purchase agreement and returned it to the Zaras.  The Zaras estimated that it would cost the Ferrises $325,000 to build their home.  Vince Zara prepared a formal "cost estimate" to that effect and the Ferrises signed a purchase agreement with TLH on February 27, 2001.  The Zaras also told the Ferrises that a builder, Larry Jones,[1] would be available to build their home.  The Ferrises subsequently signed a contract with Jones to do the "dry-in" work.  It turned out that Jones was actually unavailable and he sub-contracted his work under the contract to Kenneth and Andrew Lipham and K.A.M.'s Log Home Builders.[2]  According to the Ferrises, the Liphams' workmanship was shoddy and they had to cure many defects.  In all, the Ferrises spent over $600,000.00 completing construction of the home.

The Ferrises assert various causes of action against these defendants.  The Ferrises argue that TLH, either independently or through its alleged agents, the Zaras, fraudulently induced the Ferrises to enter into contracts with TLH, fraudulently misrepresented the cost to construct their log home,

---

[1]     Larry Jones is a named defendant in this lawsuit.  Because Jones did not answer the Ferris' complaint, a default judgment was entered against him.

[2]     Kenneth and Andrew Lipham and their business K.A.M.'s Log Home Builders are also named defendants in this lawsuit.  These parties did not file an answer in this matter and default judgments were also entered against these defendants.

and fraudulently misrepresented that TLH would perform "turnkey" construction services.  The Ferrises assert similar claims against the Zaras.  The Ferrises also contend that TLH breached the purchase agreement and the warranties contained therein.  The Ferrises seek compensatory and punitive damages.  TLH and the Zaras move for summary judgment on each of these claims.[3]

## II.  SUMMARY JUDGMENT STANDARD

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986).  The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which

---

[3]       The Ferrises, by failing to respond to the defendants' motions as to their claims for negligent misrepresentation and outrage, appear to have abandoned those claims.  The Ferrises also appear to have abandoned their fraudulent inducement claims against the Zaras as it relates to the Larry Jones and Kenneth Lipham contracts.  Therefore, the Court will grant the defendants' motions as to these claims.

the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.

### III.  APPLICABLE STATE LAW

The first issue raised by the parties is whether Tennessee or Kentucky law governs these proceedings.  "It is well-established that federal courts sitting in diversity must apply the choice-of-law rules of the forum state."  Cole v. Mileti, 133 F.3d 433, 437 (6th Cir. 1998) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).  Because the parties contend that this issue is controlled by a contractual choice-of-law provision,[4] the Court first turns to the language of their contract.  The choice-of-law provision provides as follows:

> This purchase agreement is entered into in Tennessee and any disputes hereunder, including any disputes concerning the lifetime limited warranty, shall be construed in accordance with the laws of the state of Tennessee.

(Purchase Agreement ¶ 11.)  Paragraph 10 of the purchase agreement contains similar language: "This purchase agreement shall be deemed a Tennessee agreement and shall be construed according to the laws of the state of Tennessee."  (Purchase Agreement ¶ 10.)

### A.  Procedural Law

TLH argues that Tennessee procedural law applies, whereas the Ferrises contend that this matter is governed by Kentucky procedural law.[5]  As a general matter, "the procedural law of the forum governs time restrictions on an action for breach, while the law chosen by the parties governs the terms of their contract."  Cole, 133 F.3d at 437.  This general rule applies "[a]bsent an express statement that the parties intended another state's limitations statute to apply . . . ."  Id.  In Cole, the

---

[4]    It appears that the choice-of-law provision has no effect against the Zaras as they are not parties to the purchase agreement.

[5]    For purposes of this Memorandum Opinion, the only procedural law at issue is the statute of limitations.

parties executed a contract that provided that it would "be governed and construed in accordance with the laws of the State of California." Id. at 435. The plaintiff signed the contract in Ohio. Id. When the defendant allegedly breached the contract, the plaintiff filed suit in an Ohio district court. Id. The defendant argued that California's statute of limitations barred the action pursuant to the choice-of-law clause. The Sixth Circuit disagreed and found that the contractual choice-of-law provision was not "an express statement that the parties intended another state's limitations statute to apply . . . ." Id. at 437. Like Cole, the parties here agreed that the purchase agreement would be "*construed* in accordance with the laws of the state of Tennessee." (Purchase Agreement ¶ 11 (emphasis added).) Similarly, there is no other language in the contract which purportedly incorporates Tennessee's statute of limitations. Therefore, the procedural law of Kentucky, the forum statute, is applicable in these proceedings.

## B.  Substantive Law

TLH and the Ferrises contend that Tennessee substantive law, pursuant to the contractual choice-of-law provision, applies to each claim asserted by the Ferrises against both TLH and the Zaras. The Zaras, who were not parties to the participation agreement, contend that Kentucky law applies to each of the tort claims asserted against them. As will be discussed more fully below, the Court would resolve the defendants' motions in the same manner under both Kentucky and Tennessee law. Therefore, it is not material for these proceedings to determine which state's substantive law applies. Instead, the Court will endeavor to make the determination if the need should arise.

## IV.  STATUTE OF LIMITATIONS

TLH contends that the Ferris' claim for breach of contract is time barred by the four year

statute of limitations under the Uniform Commercial Code ("UCC") and the Ferris' claims for fraud are time barred under Tennessee's three year statute of limitations for damage to property. The Ferrises argue that their claims are not time barred. The Ferrises insist that Kentucky's 15-year statute of limitations for breach of a written contract applies to their contract claim and Kentucky's five year statute of limitations applies to their fraud claims. Because Kentucky procedural law governs these proceedings, the Court will apply Kentucky's statute of limitations.

### A.  Breach of Contract

The statute of limitations under the UCC, and not Kentucky's general 15 years statute of limitations for breach of a written contract, controls the Ferrises breach of contract claim. Article 2 of the UCC "applies to transactions in goods." KRS 355.2-102. "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." KRS 355.2-105. The applicability of Article 2 "is determined by analyzing whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods with labor incidentally involved." Wehr Constructors, Inc. v. Steel Fabricators, Inc., 769 S.W.2d 51, 54 (Ky. Ct. App. 1988) (citing Allied Indus. Serv. Corp. v. Kasle Iron & Metals, Inc., 405 N.E.2d 307 (Ohio 1977)); see also Trinity Indus., Inc. v. McKinnon Bridge Co., 77 S.W.3d 159, 176 (Tenn. Ct. App. 2002) (holding that a contract to sell fabricated steel for purposes of building a bridge was a contract for the sale of goods). Here, the contract is undoubtedly one for the sale of goods, and if any labor or services were involved, they were only incidental to the sale of the log home package. The contract specifically delineates the component parts which were being sold and delivered as part of the log home package and each of those parts were movable at the time of their identification. TLH

was not selling a log home, but a package of log home component parts.

Under Kentucky law, "[a]n action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued." KRS 355.2-725(1). Significantly, "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach," KRS 355.2-725(2), and "[a] breach of warranty occurs when tender of delivery is made . . . ." Id. The only exception is "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance . . . ." Id. Under those circumstances, "the cause of action accrues when the breach is or should have been discovered." Id. Here, it is undisputed that delivery of the log home package occurred in April 2001. (Kathleen Ferris Depo. 74:10-18, Sept. 14, 2007.) The Ferrises argue that TLH breached the contract by failing to provide "turnkey" construction services and not being with the Ferrises "every step of the way." The Ferrises, however, admittedly discovered this breach in late April 2001 when they learned that the Zaras were not going to act as general contractors on the project. (Lance Ferris Depo. 51:13-52:4 Sept. 14, 2007.) The limitations period began running, at the latest, from this date. However, this action was not commenced until February 23, 2006, well outside the four year limitations period. The Ferris' claim for breach of contract is therefore time-barred and, judgment will be entered in favor of TLH on this claim.

## B. Fraud

Under Kentucky law, "[a]n action for relief or damages on the ground of fraud or mistake" must be brought "within five (5) years after the cause of action accrued . . . ." KRS 413.120(12). Here, the Ferrises contend they were fraudulently induced to enter into an agreement on or about February 27, 2001 and that TLH and the Zaras committed promissory fraud in conjunction with that

agreement.  Because this action was commenced within five years from the purported inducement, the Ferris' fraud claims are not time-barred.

## V.  FRAUD CLAIMS

The Ferrises assert separate causes of action for fraudulent inducement and promissory fraud. In a claim for fraudulent inducement, the plaintiff must prove "(1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance." Lowe v. Gulf Coast Dev., Inc., No. 01-A-019010CH00374, 1991 WL 220576, at *7 (Tenn. Ct. App. Nov. 1, 1991) (citing Gibraltar Savs. v. LDBrinkman Corp., 860 F.2d 1275, 1298-99 (5th Cir. 1988)).[6]  In contrast, to establish a claim for promissory fraud, "a plaintiff must establish (1) 'an intentional misrepresentation with regard to a material fact,' (2) the defendant's knowledge of the falsity of the misrepresentation, (3) the plaintiff's reasonable reliance and resulting injury, and (4) that the misrepresentation embodied 'a promise of future action without the present intention to carry out the promise.'" WYCQ, Inc. v. Nat'l Music Mktg., Inc., No. 3:05-cv-0979, 2008 WL 56027, at *6 (M.D. Tenn. Jan. 3, 2008) (quoting Shah v. Racetrac Petroleum Co., 338 F.3d 557, 566-67 (6th Cir. 2003)).[7]  The distinction between these claims is minor.  Apparently, the only difference is that one

---

[6]       Under Kentucky law, to establish a claim for fraud, the plaintiff must similarly prove "(1) a material misrepresentation; (2) which is false; (3) which was known to be false, or made recklessly; (4) made with inducement to be acted upon; (5) which is acted upon in reliance thereon; and (6) causes injury." Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1444 (6th Cir. 1993) (citing Compressed Gas Corp. v. U.S. Steel Corp., 857 F.2d 346, 349-50 (6th Cir. 1988)).

[7]       Unlike Tennessee, Kentucky does not recognize promissory fraud as a distinct cause of action.  Instead, claims related to "false promises" fall under the general umbrella of fraudulent inducement.  See Schroerlucke v. Hall, 249 S.W.2d 130, 132 (Ky. 1952) ("the state of the

requires a "misrepresentation of a past or existing fact," i.e. a "false statement," and the other requires proof of a promise with "an intention to not to perform at the time the representation was made," i.e. a "false promise." <u>Gibraltar Sav.</u>, 860 F.2d at 1299.  Because these claims are so closely related and the dispute between the parties is related to elements which are common to both claims, the Court will address the fraud claims together.

As far as the Court can tell, the Ferris' fraud claims are based upon the following allegations: (1) that TLH or its agent promised they would build the Ferris' home on a turnkey basis with no intent to provide those services, (2) that TLH or its agent misrepresented the nature of the relationship between the parties, (3) that TLH or its agent misrepresented that Larry Jones would be available to build the Ferris' home, and (4) that TLH or its agent misrepresented their opinion as to the estimated cost to build the Ferris' home.  The defendants, however, argue that these alleged "false statements" and "false promises" cannot be the basis of a fraud claim.  First, the defendants argue that the representations are not actionable because they do not relate to a past or present fact.  Second, the defendants argue that representations not contained in the written purchase agreement are inadmissible and, in any event, could not be reasonably relied upon by the Ferrises.  Third, TLH argues that even if these representations were fraudulent, the fraud was not perpetrated by them, but by their independent contractors, the Zaras.  The Court will address these arguments in turn.

### A.  Misrepresentation

As a general matter, for a representation to be actionable, it must relate to a present or

---

promissor's mind at the time he makes a promise is a fact which is exclusively within his own knowledge and if an intent is represented as being one thing whereas in fact it is the opposite, there is a prima facie presumption that the statement was made not as opinion but as a positive affirmation adapted to the end of inducing entrance into a contractual relation. Such promissory representation made with such intention is commonly called 'fraud in the inducement.'")

historical fact.  See Hamilton v. Galbraith, 15 Tenn. App. 158, 166-67 (1932) ("it is an accepted

general principle that fraud cannot be predicated upon a mere expression of opinion"); accord

McHargue v. Fayette Coal & Feed Co., 283 S.W.2d 170, 172 (Ky. 1955) ("Actionable

misrepresentation must relate to a past or present material fact").  However,

> [i]f a person makes a statement for the fraudulent purpose of deceiving another and
> thereby inducing him to enter into a contract or assume an obligation, it is a
> fraudulent misrepresentation warranting relief to the party defrauded, although the
> statement relates to that which is properly matter of opinion rather than matter of
> fact, or although the person expressing it puts it forward as his opinion, if he knows
> it to be false or does not believe it to be true, or if he does not in reality hold any such
> opinion or holds a contrary opinion.

Id. at 167 (quotation omitted); Elec. Hammer Corp. v. Deddens, 206 Ky. 232, 237, 267 S.W. 207,

209 (1924)  ("redress may be had for the dishonest expression of an opinion contrary to that really

entertained by the speaker, especially if he is an apparently disinterested third person, or if a

deliberately false opinion is expressed in terms importing personal knowledge of its truth, or for a

promise made with the present intent of future breach.").  It is because "the state of a man's mind

is as much a fact as the state of his digestion . . ." that a "misrepresentation of opinion, belief, or

intent is an actionable representation of fact."  Deddens, 267 S.W. at 209.

      The Court finds that there is sufficient evidence in the record from which a jury could find

that TLH, through the Zaras, misrepresented the type of construction services that would be

provided by TLH and the Zaras, (see Kathleen Ferris Depo. 67:6-11 (evidence that the Zaras told

the Ferrises that they would be on the job site every day running the project), and that Larry Jones

was available to build the Ferris' home, (see id. 72:1-9 (evidence that the Zaras misrepresented

Larry Jones' availability.)  Furthermore, there is evidence that the cost estimate prepared by Vince

Zara was fraudulent.  A former TLH employee, for example, characterized the estimate as "way too

low." In his deposition, Jock Davidson was asked about the estimate:

> Q.     What would you have discussed?
>
> A.     I would have asked them [the Zaras], one, how they came up with these numbers because they're obviously way too low . . . .
>
> * * * * *
>
> Q.     Based upon your knowledge and information, experience, do you think $425,000 is a reasonable response to him for what actually was constructed on Lake Malone on his property?
>
> A.     What I would say is this, is that I don't know what was discussed exactly. I don't remember. But I would say that a 3,000 plus square foot home on a full basement was going to take more than, what was it? $288,000 or something like that? I mean, *that on its face is ridiculous to the extreme*.
>
> Q.     Okay. How ridiculous? Quantify in numbers.
>
> A.     About $150,000 ridiculous. I believe I might have mentioned that to Mr. Ferris.
>
> Q.     So $288,000 you're saying is at least $150,000 way too low?
>
> A.     I would say at least $100,000 too low and probably more depending on those variables we discussed.

(John Davidson, III Depo. 43:23-44:1, 45:8-46:1, Nov. 24, 2008 (emphasis added).)

Whether these alleged representations were fraudulent or reckless depends on the Zaras' state of mind which "is typically not a proper issue for resolution on summary judgment." Coffey, 992 F.2d at 1448 (internal quotations and citations omitted). When the evidence in the record is viewed in the light most favorable to the Ferrises, a jury could conclude that the Zaras either "intentionally or by design produce[d] a false impression in order to mislead" the Ferrises into signing the contract with TLH. Shell Oil Co. v. State Tire & Oil Co., 126 F.2d 971, 974 (6th Cir. 1942) (applying Tennessee law). This would be "positive fraud in the fullest sense of the term." Id.

11

**B.  Contractual Merger Clause**

The defendants also argue that the alleged misrepresentations are not actionable because of a merger clause contained in the purchase agreement.  The clause provides:

> All representations, statements and agreements heretofore made between the parties are merged in this agreement which alone fully and completely expresses their respective obligations and this agreement is entered into by each party after opportunity for investigation, neither party relying on any statements or representations not embodied in this agreement made by the other or on any party's behalf including specifically any such statements or representations made by the dealer.

(Purchase Agreement ¶ 10.)  The defendants contend that based on the plain and unambiguous language of the contract, any fraud claim based on representations not contained in the agreement are barred.  Such a rule appears to have been adopted in some jurisdictions.  In Galmish v. Cicchini, 734 N.E.2d 782, 790-91 (Ohio 2000), for example, the Ohio Supreme Court held that "the parol evidence rule does apply 'to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement.  Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible.'" Id. (quoting Alling v. Universal Mfg. Corp., 7 Cal. Rptr. 2d 718, 734 (Cal. Ct. App. 1992)).

Tennessee and Kentucky courts have rejected such a rule.  In Shah, the Sixth Circuit applying Tennessee law held that "Tennessee law 'does not require ambiguity when certain defects in the formation of the agreement are demonstrated; parol evidence can be admitted to contradict or vary the terms or enlarge or diminish the obligation of a written instrument upon a showing of fraud.'"  Shah, 338 F.3d at 567 (quoting Cincinnati Ins. Co. v. Avery, 914 F.2d 255 (table), 1990 WL 132245, at *3 (6th Cir. 1990)); accord Radioshack Corp. v. Comsmart, Inc., 222 S.W.3d 256, 259 (Ky. Ct. App. 2007) ("neither the parol evidence rule nor the merger and integration clauses in

12

the contract precluded [the plaintiffs] from presenting evidence on their misrepresentation claim.").

To be sure, "parol testimony is not admissible to vary the terms of a writing. When the negotiations

are completed by the execution of the contract, the transaction, *so far as it rests on the contract*, is

merged in the writing." Radioshack Corp., 222 S.W.3d at at 260 (citation omitted) (emphasis

added). However, "false and fraudulent representations made by one of the parties to induce the

other to enter into the contract are not merged in the contract." Id. Instead, a claim of fraudulent

inducement "sounds in tort rather than contract" and, therefore, "the parol evidence rule does not

apply." Id. at 261 (citation omitted); Shah, 338 F.3d at 567 (the parol evidence rule does not apply

because "promissory fraud sounds in tort, not in contract.") (citation omitted).

The defendants also contend that, as a matter of law, the Ferrises could not have reasonably

relied upon the alleged misrepresentations in light of the merger clause. However, the Sixth

Circuit's reasoning in Shah precludes such an argument. There, the Shahs were interested in running

a Raceway gas station and convenience store. Shah, 338 F.3d at 561. To do so, they were required

to lease the premises and enter into a contract with the owner of the property. Id. The contract and

lease provided that "at any time during the initial or any extended term, either party may give thirty

(30) days written notice . . . of its intent to terminate this Lease [or Contract]." Id. at 562. The

documents also contained a merger clause which provided that "[t]his Contract supersedes and

cancels all previous contracts or arrangements between the parties relating to the matters herein and

no prior or subsequent stipulation, agreement or understanding, verbal or otherwise, of the parties

or their agents relating to the matters herein shall be valid or enforceable unless embodied in the

provisions of this Contract, or a separate instrument in writing." Id. at 563. The Shahs, however,

signed the agreement based upon the lessor's representations that it would "not kick any dealer out

13

as long as they perform satisfactorily." Id. (quotation omitted).  The lessor argued that the matter

was appropriately dismissed on summary judgment by the district court because "it is unreasonable

per se to rely on oral representations when the contract contains an integration clause." Id. at 568.

The Sixth Circuit disagreed and held that "[p]romissory fraud under Tennessee law does require

reasonable reliance, . . . but nothing suggests the Tennessee judiciary has either adopted or would

adopt a per se rule that an integration clause makes it always unreasonable to rely on prior oral

representations." Id. (citations omitted); accord Radioshack, 222 S.W.3d at 259 (merger clause did

not preclude misrepresentation claim under Kentucky law).  Despite the merger clause, the Sixth

Circuit concluded that a genuine issue of material fact existed as to the Shahs' promissory fraud

claim. Id.  Here, the merger clause in the purchase agreement likewise does not preclude reasonable

reliance upon the alleged misrepresentations.

 The defendants also cite to other provisions of the purchase agreement which they argue

directly contradict the misrepresentations alleged by the Ferrises:

> (8) **Other Labor and Materials**.  Seller takes no responsibility for cost, quality or availabilities of any labor or materials other than those items listed explicitly on this agreement.  This includes any recommendations of labor crews or materials from any dealer or employee of seller.  Purchaser acknowledges and understands that it must purchase separately all other materials or services needed for the construction of its building, and said materials and services shall be purchaser's sole cost and responsibility.

> (9) **Construction of Package**.  Purchaser acknowledges that seller is not liable for any construction and that purchaser has not relied on the seller to select the proper log home package for it.  Purchaser acknowledges that it has been advised of the importance of using a licensed general contractor experienced in the construction of log home packages and the potential for problems if an inexperienced builder is used.  Purchaser will indemnify and hold seller harmless from any and all claims relating to faulty construction of the log home package purchased pursuant to this purchase agreement.

(Purchase Agreement ¶¶ 8-9.)  If these contractual provisions directly and unambiguously contradict

the alleged misrepresentations, then reliance upon the representations would likely be unreasonable. See Davis v. Siemens Med. Solutions USA, Inc., No. 3:04CV-195-MO, 2007 WL 710133, at *4 (W.D. Ky. Mar. 6, 2007) ("If [plaintiff] was presented with a Plan whose [terms] could reasonably be interpreted in only one way, and that way directly contradicted the oral representations allegedly made by [defendant], . . . it necessarily follows that [plaintiff's] reliance on the oral representations was not reasonable . . . .").  However, the Court cannot say, as a matter of law, that these provisions directly contradict the misrepresentations alleged by the Ferrises.  Certainly, the purchase price under the agreement does not cover anything other than the materials listed in the purchase agreement.  And if the Ferrises chose to build the home on their own, TLH would not be responsible for the construction or the cost of any services or additional materials needed to build the home.  The Ferrises do not suggest otherwise.  Instead, the Ferrises insist that they were led to believe that TLH would be constructing their home, that the estimated cost to build the home was $325,000, and that the Zaras would be on the site everyday to run the project.  These alleged representations seem consistent with advertisements published by TLH.  In at least one advertisement, TLH suggests that if the purchaser of a package did not want to build their own home, TLH could provide a complete turnkey home.  (See DN 87, Ex. 2.)  The advertisement also suggests that TLH would guide the purchaser every step of the way.  (See id.)  Whether the terms of the purchase agreement directly contradict the alleged misrepresentations is a determination more appropriately left to the jury as is whether the Ferrises reasonably relied upon those representations.  This was not a business transaction between two sophisticated parties.  Instead, the Ferrises were consumer purchasers living hundreds of miles away depending upon others to build their house for them.  It is possible that the Zaras, who held themselves out as having specialized knowledge in log home construction, created

15

an aura of legitimacy.  Johnson v. Lowery, 270 S.W.2d 943, 945 (Ky. 1954) (one factor that is relevant in determining whether a party justifiably relied upon another's opinion is whether the maker of the opinion "'holds himself out as having special knowledge of the matter which the recipient does not have . . . .'") (quoting Restatement (Second) of Torts § 542(a)).  For these reasons, the Ferrises have put forth a minimal prima facie case of fraud.  Accordingly, summary judgment is not appropriate.

### C. Agency

TLH argues that based on the plain language of the purchase agreement with the Ferrises and the license agreement with the Zaras, there is no agency relationship between TLH and the Zaras. TLH contends that if the Zaras are not TLH's agents, then any fraud committed by the Zaras cannot be imputed to it.  The Ferrises respond by arguing that there was an actual agency relationship between TLH and the Zaras.  The Ferrises alternatively argue that, even if there was no actual agency relationship, there was an apparent agency relationship between the defendants and that TLH ratified the fraud committed by the Zaras.  To address the parties' arguments, the Court first turns to the purchase agreement which provides:

> **Dealer is not Agent**: Your Tennessee Log Homes, Inc., dealer is an independent contractor and not an agent or employee of seller and they have no authority to bind or obligate seller in any manner whatsoever.

(Purchase Agreement ¶ 7.)  The licensing agreement between TLH and the Zaras has similar language:

> Licensee is an independent contractor and is not an agent, employee, partner, or joint venture of Licensor.  Licensee has no authority to bind or obligate Licensor and shall make no representations to third parties that form any suite, costs, charges, damages, and expenses including, but not limited to, attorney's fees arising from Licensee's negligence, giving of misinformation, misconduct, or the violation of any provision[] of this agreement.

16

(Tennessee Log Homes Dealer License Agreement ¶ 7.)  The plaintiffs' claims of apparent agency and ratification are without merit.  Signing the purchase agreement which attempts to disclaim an agency relationship between the Zaras and TLH defeats the Ferrises claim of apparent agency.  See Boren ex rel. Boren v. Weeks, 251 S.W.3d 426, 436-437 (Tenn. 2008) (providing meaningful notice precludes a finding of apparent authority); accord Floyd v. Humana of Virginia, Inc., 787 S.W.2d 267, 270 (Ky. Ct. App. 1990).  And although the Ferrises discuss the law of ratification in their briefs, they do not cite to any record evidence which identifies whether TLH was aware of the fraud committed by the Zaras and subsequently ratified it.  Based on the foregoing, the representations of the Zaras could only be imputed to TLH if there was an actual agency relationship between them.

"In its broadest sense, the concept of agency 'includes every relation in which one person acts for or represents another.'" White v. Revco Disc. Drug Ctrs., Inc., 33 S.W.3d 713, 723 (Tenn. 2000) (quoting Kerney v. Aetna Cas. & Sur. Co., 648 S.W.2d 247, 253 (Tenn. Ct. App. 1982)); see also CSX Trasp., Inc. v. First Nat'l Bank of Grayson, 14 S.W.3d 563, 566 (Ky. Ct. App. 2000) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.") (quotation omitted).  TLH primarily relies upon its licensing agreement with the Zaras which indicates that the relationship is that of independent contractor.  However, "[a]n agency relationship does not require an explicit agreement, contract, or understanding between the parties, . . . and when the facts establish the existence of an agency relationship, it will be found to exist *whether the parties intended to create one or not*." Id. (emphasis added); see also CSX Transp., Inc., 14 S.W.3d at 566 (holding that an agreement characterizing the relationship between parties as independent contractors is not dispositive).  TLH also argues that it had no control over the Zaras

17

and that the Zaras were only dealers for TLH.  However, the nature of the relationship was more akin to that of a broker or salesperson rather than a dealer.[8]  For instance, the Zaras had no authority to enter a binding contract on behalf of TLH.  Instead, the Zaras would negotiate on behalf of TLH, notify TLH about potential purchasers and the type of log home package they wanted to buy, and then induce the potential purchasers to sign the contract with TLH.  During this process, TLH had no contact with the purchaser and would rely upon the Zaras to negotiate on its behalf.  If the Zaras could procure a sale, TLH would compensate the Zaras with a commission of up to 20 percent.  The Ferrises "cannot be beguiled into purchases by the material misrepresentations of sales agents and told by owners upon making complaint that they, the owners, were not responsible for the loud and boastful assertions made by the agents during the stimulating of the purchasing desires of the customer."  Hunt v. Walker, 483 S.W.2d 732, 737 (Tenn. Ct. App. 1972) (quotation omitted).  Instead, "[i]t is safer to hold vendors liable for the false or untrue representations of matters of fact made by brokers during negotiations."  Id.; see also Isaacs v. Cox, 431 S.W.2d 494, 495-96 (Ky. 1968) ("If the representations are made by the agent as a part of the negotiation for the purpose or bringing about the sale, and by means of this it is brought about, the conveyance made, and the proceeds of sale received, this brings the case within the general rule that a principal is responsible for such acts of his agent as are done within the scope of his authority, whether authorized or not, except by the general authority to do the principal act") (quotation omitted).  TLH cites Durham v. Waddell & Reed, Inc., 723 S.W.2d 129 (Tenn. Ct. App. 1986) for the proposition that the Zaras "exceeded all authority granted by TLH."  In Durham, however, the issue before the court was not

---

[8]     A broker is "[a]n agent who acts as an intermediary or negotiator, esp[ecially] between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation." Black's Law Dictioanry (8th ed. 2004).

whether the employee had actual authority to act on behalf of the principal.  The parties agreed that the employee lacked such authority and the only issue before the court was whether the employee had apparent authority to act on behalf of the principal.  <u>Durham</u>, 723 S.W.2d at 130.  Here, however, the licensing agreement explicitly granted authority to the Zaras to generate contracts for the sale of log home packages on behalf of TLH.  (Licensing Agreement ¶ 6.)

Under Tennessee law, "[w]hether an agency exists is a question of fact under the circumstances of the particular case . . . ."  <u>White</u>, 33 S.W.3d at 723 (quotation omitted).  However, Kentucky law provides that "whether a person is an agent or independent contractor is a question of law for the court."  <u>Nazar v. Branham</u>, --- S.W.3d ----, 2009 WL 1108107, at *6 (Ky. 2009).  But for this conflict in laws, the Court would be inclined to find that the Zaras were TLH's actual agents. At the very least, however, there is a genuine issue of material fact precluding summary judgment on this issue.

## VII. *DAUBERT* CHALLENGES

TLH also seeks to exclude or limit the testimony of the Ferris' three expert witness on grounds that all or a portion of their opinions do not satisfy the standards of <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993) and Fed. R. Evid. 702.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert testimony is both reliable and relevant.  <u>Mike's Train House, Inc. v. Lionel, L.L.C.</u>, 472 F.3d 398, 407 (6th Cir. 2006) (citing

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)).  In determining whether certain testimony is reliable, the focus of the Court "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.  In Daubert, the Supreme Court identified a non-exhaustive list of factors that may assist the Court in assessing the reliability of a proposed expert's opinion including (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." Id. at 592-94.  This gatekeeping role is not limited only to expert testimony based upon scientific knowledge, but, instead, extends to "all 'scientific', 'technical,' or 'other specialized' matters within" the scope of Rule 702. Kumho Tire, 526 U.S. at 147-48.  And whether the Court applies the Daubert factors to assess the reliability of the testimony of an expert witness "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. at 150 (quotation omitted).

### A.  Stephen Brockman

TLH seeks to exclude Stephen Brockman's testimony as it relates to the adequacy of the design plans prepared by TLH and as it relates to the cost to repair the Ferris' home.  TLH argues that Mr. Brockman's testimony should be excluded because it is based upon his *ipse dixit* and unreliable methodologies.  TLH first takes issue with Mr. Brockman's opinion as it relates to the inadequacy of the design plans prepared by TLH.  (TLH's Mem. Supp. Mot. in Limine at 7.)  TLH contends that there is no reliable basis for Mr. Brockman's opinion because he could not point to any jurisdiction that has adopted any building codes as it relates specifically to the log home industry.  (Id.)  TLH misconstrues Mr. Brockman's testimony.  Although Mr. Brockman testified

that there have been no standards enacted in law as it relates specifically to the building of log homes, he testified that the building of log homes must still comply with general building codes. Furthermore, he specifically testified that, based on his experience, the log home design prepared by TLH did not comply with the industry standard as it relates to log home manufacturers. To perform his assessment in this case, Mr. Brockman conducted a site visit, performed visual observations, took photographic records, and took measurements. He also reviewed the relevant building plans. Based on his experience, which entails over 15 years of engineering experience in the log home construction industry, Mr. Brockman testified that he is aware of no manufacturer which provides as little detail in their building plans as does TLH. This opinion is not only based on his experience in the industry, but also generally accepted engineering standards and building codes. In other words, the principles and methods employed by Mr. Brockman were not based on his *ipse dixit*, but appear to be a reliable method of assessing the plans prepared by TLH for the Ferrises. See, e.g., Zerega Ave. Realty Corp. v. Hanover Ins. Co., No. , 2006 WL 1343643, at *4 (S.D.N.Y. 2006) ("Drawing upon one's educational background and practical experience is a reliable methodology through which to develop opinions and reach conclusions about scientific, technical, or other areas of specialized knowledge.").

TLH also challenges Mr. Brockman's testimony as it relates to the cost to cure the structural defects on the Ferris' home. However, Mr. Brockman's testimony establishes that his opinion is sufficiently reliable to meet the requirements of Daubert. Mr. Brockman testified that he based his opinion on the observations of defects in the construction of the home, the square footage of the damaged areas, base numbers from national figures through online research, a means manual, and applying a litigation adjustment. It is apparently this litigation adjustment with which TLH takes

issue.  However, Mr. Brockman testified that contractors charge more for repairing a construction when there is "contention" or litigation because the contractors "want to make sure they're covering themselves and have adequate funding in the project to do everything so that they do things without opening themselves up to potential litigation."  (Brockman Depo. 93:1-7, Aug. 25, 2008.)  His testimony is based on his experience in the field.  Although TLH may not agree with the conclusion reached by Mr. Brockman, the proper way to challenge that conclusion is during cross-examination at trial.  For these reasons, the Court finds that Mr. Brockman's opinions are sufficiently reliable to meet the requirements of Rule 702 and Daubert.

### B.  Kevin Maynard

TLH's objections to the testimony of Kevin Maynard are likely without merit.  TLH challenges Mr. Maynard's testimony because Mr. Maynard referred some of the issues he observed in the construction of the home to a structural engineer.  Mr. Maynard performs log home inspections and has otherwise worked in the log home construction industry since 1998.  He testified that his job as a log home inspector is to identify defects in the construction of log homes.  If, during this inspection, he determines that there are potential problems in the construction of the home, he will refer the matter to an expert that is qualified to make that type of assessment, such as a structural engineer.  The plaintiffs acknowledge that Mr. Maynard is not qualified to give an opinion as to matters which were referred to a structural engineer.  The plaintiffs also represent that Mr. Maynard will not be offering testimony in that regard.  (See Pls.' Resp. Mot. in Limine at 8 ("Maynard does not offer opinions as to how to remedy structural problems in the Ferris['] log home, for which he has acknowledged he is not qualified.")).  Because Mr. Maynard is only offering an opinion about defects that fall under his expertise as a log home inspector and TLH offers no

other basis to exclude Mr. Maynard's testimony, the Court finds that Mr. Maynard's testimony satisfies the requirements of Rule 702.

## C.  Clay Wells

TLH objects to Clay Wells' testimony on grounds that it is based in part upon the testimony of Mr. Brockman.  TLH contends that because Mr. Brockman's expert opinion as to repair costs is unreliable, then Clay Wells's opinion, which is based upon Mr. Brockman's opinion, is equally unreliable.  Because the Court has already concluded that Mr. Brockman is qualified to testify as an expert as to the cost to repair the Ferris' home, there is no reason to exclude Mr. Wells's opinion for relying upon Mr. Brockman's opinion.

## VIII.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motions by Tennessee Log Homes, Inc. [DN 75] and Vince and Pat Zara [DN 72] for summary judgment are **GRANTED in part** and **DENIED in part**.  They are denied with respect to the plaintiffs' claims for fraudulent inducement and promissory fraud as to the TLH purchase agreement.  They are granted in all other respects.  **IT IS FURTHER ORDERED** that the motion in limine by Tennessee Log Homes, Inc. [DN 74] is **DENIED**.

cc:      Counsel of Record